UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 CR 00662-1 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| NICHOLAS WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

In December 2018, four plainclothes Chicago police officers were driving in two police cars on patrol in the north side of the City. At around mid-day, they pulled alongside Nicholas Williams, who was walking on the sidewalk. As the officers opened their car doors, Williams ran away while clutching his left side. The officers gave chase. Williams dodged around a building security guard (the guard happened to be nearby) and then twice hopped a fence. Eventually, one officer caught up and ordered Williams to the ground. The officer straddled Williams, handcuffed him, and patted him down; a gun was found in Williams's left pocket. When asked, Williams admitted that he did not have a license to carry the gun.

Williams is now charged with being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1); R. 1, Indictment.[1] Williams moves to suppress the firearm, drugs (which were also found on him), and any post-arrest statements. R. 33, Mot. Suppress at 1. The Court held an evidentiary hearing on the motion, during which only the arresting

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

officer testified. R. 64. After the hearing, the parties filed supplemental briefs. For the reasons discussed below, the motion to suppress is denied.

## I. Background

At around 11:45 a.m. on December 8, 2018, Chicago police officers Michael Callahan, William Murphy, Roman Zawada, and Brett Kellam were patrolling Chicago's Near North Side in two cars in the vicinity of the Cabrini-Green Rowhouses, which are part of a Chicago Housing Authority complex. R. 65, Tr. at 27, 29–31. Callahan and Murphy were in the front car; Zawada and Kellam were in the second car following directly behind. Tr. at 51. Both of the police cars were Crown Victorias, which are typical law enforcement vehicles, and both had municipal license plates (including on the front of the cars). Tr. at 59–60. Although the officers were not wearing police uniforms, Callahan wore an outer vest with a police star on it (along with his name and star number), and he also wore a duty belt with a gun and handcuffs. Tr. at 30.

As the officers traveled south along the 900 block of N. Cambridge Avenue, they saw Nicholas Williams walking alone on the sidewalk in the opposite direction. R. 33, Exh. B, Joint Video 1 at 11:48:31 AM.[2] Because Williams was by himself, Callahan testified, Williams made an attractive candidate for a field interview; according to Callahan, he typically gets more accurate information when others are not around. Tr. at 34–35; R. 33, Exh. A, Arrest Report at 3. The front car pulled to a stop just beyond Williams and the rear car stopped a few feet in front of him. *Id.* at 11:48:23-35 AM.

---

[2]At the suppression hearing, the POD camera—a police camera affixed over Cambridge Avenue—was introduced as Joint Video Exhibit 1. The body camera worn by one of the officers was introduced as Joint Video Exhibit 2.

But as soon as the officers opened their doors to get out, Williams sprinted away from them, running northward down the middle of the street. Tr. at 35:19-23; R. 33, Exh. B, Joint Video 1. Immediately, the officers gave chase on foot. Tr. at 36:16-19.

Just seconds after starting to run, Williams began to make continuous clutching gestures towards the left side pocket of his jacket. R. 33, Exh. B, Joint Video 1 at 11:48:35-42 AM. Officer Callahan testified that, in his experience, this sort of pocket grabbing suggested that Williams was trying to secure an unholstered weapon. Tr. at 35:19-36:15. Based on this behavior, Callahan testified, he believed that Williams was armed. *Id.* at 36:16-19.

As Williams fled away on the street, he abruptly dodged a Cabrini-Green housing security officer who had run into the street to join the officers' chase. *Id.* at 81:3-82:3, 54:17-22; R. 33, Exh. B, Joint Video 1 at 11:48:39-43 AM. Williams then veered left into a courtyard within the Chicago Housing Authority complex, with Callahan and Zawada pursuing close behind. Joint Video 1 at 11:48:45-54. From there, Williams scaled a security fence along the west side of the complex, and then ran south along the other side of the fence, parallel to the complex. Tr. 38:24-39:4. Callahan continued chasing Williams along the opposite (internal) side of the fence, running in parallel, until Williams scaled back over the same fence further south. *Id.* at 39:11-23. Upon Williams's reemergence, Callahan caught up, identified himself as police, and ordered Williams to "get on the ground." *Id.* at 39:20-25. Williams complied. *Id.* at 39:24-40:2. As Williams lay down, Callahan heard a "metallic clink" that sounded

"like dropping metal on concrete." *Id*. at 40:11-20. That sound "reconfirmed [Callahan's] suspicions" that Williams was carrying a gun in his jacket pocket. *Id*. at 42:3-6.

Because no other officers had yet arrived on the scene, Officer Callahan "climbed on top of [Williams]" and placed him in handcuffs to perform a protective pat-down for weapons. *Id*. at 42:7-19. That search revealed an object in Williams's left pocket that Callahan believed to be a handgun. *Id*. at 42:18-21. Using gloves, Callahan retrieved a Glock 22 semi-automatic pistol from Williams's pocket, loaded with an extended magazine containing 22 rounds of live munition. *Id*. at 45:1-5; R. 33, Exh. A, Arrest Report at 3. Callahan then asked Williams whether he possessed a concealed-carry card. *Id*. at 45:1-24; 92:22-25; 107:25-108:3. Williams replied that he did not. *Id*. No *Miranda* warning was provided. *Id*. at 92:22-25;. Officer Zawada—who by now had joined the encounter—next asked Williams whether he had an FOID card, but Williams again replied that he did not. *Id*. at 45:1-24; 92:22-25; 107:25-108:3. Callahan then told Williams that he was now under arrest. *Id*. at 45:25-46:6; 47:9-12. A later custodial search of Williams uncovered 22 bags of crack cocaine on his person. *Id*. at 47:18-23. It is not disputed that lab testing later revealed the substance to be 2.5 grams of cocaine base (that is, crack cocaine). R. 41 at 3.

## II. Analysis

### A. Reasonable Suspicion and Probable Cause

Williams argues that the seizure and search violated the Fourth Amendment. The Fourth Amendment protects individuals against unreasonable searches and seizures. Even so, "an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore permissible, if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) (cleaned up).[3] Reasonable suspicion requires "more than a hunch," but need not rise to the more-demanding standard of probable cause. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Mays*, 819 F.3d at 955 (cleaned up). The evaluation of the circumstances is "based on common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)); *see also United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) ("What matters is whether a reasonable police officer, faced with the circumstances confronting [the arresting officer], would believe that [the defendant] posed a danger to those in the immediate vicinity.").

In the course of an investigatory stop, it is also possible that "[p]olice restraint may be so intrusive that, while not technically an arrest, it becomes tantamount to

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

an arrest requiring probable cause." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). A police officer possesses probable cause if at the time the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In ascertaining whether an officer has probable cause, a court must consider the totality of the circumstances from the perspective of a reasonable person in the position of the officer. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008); *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

### B. Initial Approach and Pursuit

Williams offers several arguments for suppressing the evidence: (1) the officers lacked reasonable suspicion to initiate the purported stop of Williams in the first instance; (2) even after starting to flee, Williams did nothing to generate reasonable suspicion for a seizure; (3) after Williams stopped fleeing, officers still lacked reasonable suspicion and probable cause to seize and to search him. R. 33 at 2-3. In addressing these arguments, because the Fourth Amendment "only protects against unreasonable searches and seizures," *Mays*, 819 F.3d at 955, the Court's "first task is to ascertain the point[s] at which Fourth Amendment concerns became implicated," *United States v. Ford*, 333 F.3d 839, 844 (7th Cir. 2003), and next to assess whether any violations occurred.

Williams first argues that the police officers violated the Fourth Amendment by approaching him without reasonable suspicion. R. 33 at 17. But reasonable suspicion is only required when a suspect has been *seized*. *United States v. Douglass*, 467 F.3d 621, 623 (7th Cir. 2006). A seizure occurs within the meaning of the Fourth Amendment "if, in the totality of the circumstances, a reasonable person would not feel free to disregard the police and move along." *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020) (cleaned up). So an "officer can approach individuals on the street or in other public places and put questions to them if they are willing to listen" without implicating the Fourth Amendment. *Gentry*, 597 F.3d at 846 (citing *United States v. Drayton*, 536 U.S. 194, 200 (1983)); *see also Douglass*, 467 F.3d at 623 ("The Fourth Amendment is not triggered when law enforcement officials merely approach an individual in a public place and ask a few questions.") Here, just because the officers stopped their cars and got out to approach Williams on the sidewalk in no way implicated *Terry* or any other Fourth Amendment protections. It was 11:48 a.m. during the day. R. 33, Exh. B, Joint Video 1 at 11:48:31 AM. The officers did not approach aggressively or otherwise instruct Williams to stop. *See id.* Indeed, they had no time to do much of anything—Williams started running just a couple of seconds (if even that) after the officers started to get out of their cars. *See id.* Joint Video 1 at 11:48:34–35 AM. No quantum of suspicion was needed to get out of the cars and start to approach Williams.

7

Nor, for the matter, was reasonable suspicion required for the officers to give chase once Williams started running. "[A] fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority." *Mays*, 819 F.3d at 956. Rather, a "seizure effected by a show of authority occurs when the suspect submits." *United States v. Griffin*, 652 F.3d 793, 801 (7th Cir. 2011); *see also United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("[A] person is seized only when, by means of physical force or a show of authority, his freedom is restrained."). Williams quite plainly did not submit to the show of authority as he fled from the officers down Cambridge and into the Cabrini-Green housing complex. So, like the initial approach toward Williams, no amount of suspicion was needed to chase Williams—he was not "seized" under the Fourth Amendment.[4]

## C. At the Fence

Indeed it was not until Williams leapt the security fence for a second time and obeyed Officer Callahan's command to "get on the ground" that a seizure was effectuated. Only at that "show of authority" did Williams finally "submit." Tr. at 39:24-40:2; *Griffin*, 652 F.3d at 801. To effectuate that seizure, reasonable suspicion was required. *Mays*, 819 at 957. Reasonable suspicion must be supported by "[s]pecific

---

[4]The Supreme Court is currently considering a case to clarify the meaning of a "seizure" under the Fourth Amendment, but only in the context of whether a "seizure" occurs when the application of physical force is unsuccessful. *Torres v. Madrid*, S. Ct. No. 19-292 (argued Oct. 14, 2020) (reviewing 769 Fed. App'x 654 (10th Cir. May 2, 2019) (unpublished)). That issue is not pertinent to Williams's flight because the officers did not apply physical force during the chase.

and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, (1968). To assess whether there is reasonable suspicion for a stop, the Court must "evaluate, under an objective standard, the totality of the circumstances known to [the officer] at the time and determine if a reasonable officer in those circumstances would have been suspicious." *U.S. v. Ford*, 333 F.3d 839, 834 (7th Cir. 2003). Here, the government relies on (1) Williams's flight from officers in a high-crime area; and (2) Williams continuously clutched at his jacket left-pocket while fleeing.

Addressing flight first, the government points to Williams's flight right after officers started to get out of the car as a basis for reasonable suspicion. R. 66 at 3-4. Williams counters that he was under no "obligation to speak to an officer," *Brown*, 925 F.3d at 1155, and that his flight alone could not justify reasonable suspicion. R. 47 at 10-11. It is true that Williams had no obligation to speak to the officers. Indeed, Callahan acknowledged that if Williams had refused to be interviewed, then Callahan "[w]ould have gotten into my car and drove away." Tr. at 34. But the lack of an obligation to talk to officers does not erase the reality that an individual's "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (*per curiam*); and *United States v. Sokolow*, 490 U.S. 1, 8-9 (1989)). Sure, a person has the right to ignore approaching police and "go about his business," but flight, by its very nature, is the "opposite" of doing so. *Id*.

9

at 125. Indeed, the Supreme Court has described flight as the "consummate act of evasion." *Id*. at 124.

In post-hearing briefing, Williams also suggests that his flight should be given "minimal weight in the reasonable suspicion analysis" because there was no evidence that he knew that the persons he was fleeing were police officers. R. 67, Def.'s Resp. at 6. But there is more than enough evidence to establish that Williams knew—or at least suspected—who they were. For one, although the police cars were not explicitly marked as belonging to the Chicago Police Department, the cars had municipal license plates, Tr. at 59–60, which readily distinguished them from regular civilian cars. Also, Callahan's car—the lead car—had four rooftop antennae, Tr. 59–60, Joint Video 1 at 11:48:30, another feature that distinguished the car from most civilian vehicles (the antennae no longer serve a function, but they are still visible on the car's rooftop). Just as importantly, the two police cars were both Crown Victorias, which are generally recognized as common police cars. Tr. 59–60; *see also Powell v. City of Chicago*, 2013 WL 1290131 at *2 (N.D. Ill. Mar. 27, 2013); *United States v. Wright*, 485 F.3d 45, 47 (1st Cir. 2007) (finding that Crown Victorias are "a model widely associated with police departments"); *United States v. Price*, 841 F.3d 703, 706 (6th Cir. 2016) (explaining that a Crown Victoria is "easily associated with police even when unmarked"). As shown by the video, Williams clearly looks at the Crown Victorias before he starts running away. Joint Video 1 at 11:48:30 AM. The municipal

plate, the antennae, and the type of car all circumstantially establish that a reasonable officer would conclude that Williams knew that the four men were in fact police officers.

Moving beyond the police cars themselves, although the officers did not wear formal police uniforms, Callahan—who was in the lead car—at least wore a vest with a large police star on its front. *Id.* at 11:48:36-38 AM; Tr. at 30. Also, Williams ran away not just from the officers but also from, as the government points out, the Cabrini-Green security officers on the street. Tr. at 28, 53; Joint Video 1 at 11:48:41 AM. Yet Williams ran away from the security officers just as purposefully as he did from the police, swerving past one of the security officers, who had reached for Williams. Joint Video 1 at 11:48:41 AM.

Even still, Williams contends that the circumstances in which the courts have found reasonable suspicion based on flight have been limited to where flight happened in a "high-crime" area and there were also other suspicious facts. R. 33 at 16-17 (citing *Mays*, 819 F.3d at 957-58; *United States v. Riney*, 742 F.3d 785, 789 (7th Cir. 2014); and *United States v. Williams*, 731 F.3d 678, 691 (7th Cir. 2013)). There are myriad problems with this contention. As an initial matter, Williams is mistaken to the extent that he argues that flight is suspicious *only* in high-crime areas. To the contrary, the Supreme Court made clear in *Wardlow* that "[h]eadlong flight—*wherever it occurs*—is the consummate act of evasion … ." 528 U.S. at 124 (emphasis added). Of course, flight is not "necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* And, as explained earlier, the officers did nothing to provoke

11

the flight, beyond simply exiting their stopped vehicles. The flight itself weighs in favor of reasonable suspicion.

What's more, the evidence supports a finding that the area in which the flight happened—the 900 block of North Cambridge—is indeed validly characterized as a "high-crime" area. Police officers "are permitted to rely on their experience and training in forming a reasonable suspicion." *Oglesby*, 597 F.3d at 894 (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)); *see United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (holding that the experience of the officer is a factor considered in judging whether reasonable suspicion justifies a frisk). In this case, Officer Callahan offered credible testimony on why he considered Williams's flight to be in a "high crime" area. As of December 2018—when Williams was arrested—Callahan had been a police officer for around eight years and had been assigned to the Area Central Gun Team for at least one year before Williams's arrest. Tr. at 11–12. The Gun Team was a specialized unit that was sent into different neighborhoods daily in response to recent crime patterns, with a focus on combatting "illegal guns," "robberies, shootings, narcotics, [and] street-level narcotic sales." Tr. at 12–13. As of December 2018, Callahan had personally made between four and eight arrests for guns and narcotics in the 18th District where Williams was stopped, and Callahan was further aware of at least 20 more arrests in the neighborhood. *Id.* at 16:25–17:14. Every month, Callahan consulted the Police Department's CLEAR computer-database of maps of criminal statistics to keep up to date on "shooting, robberies, burglaries, home invasions." *Id.* at 19:12–21:1; Gov. Exh. CLEAR Map. At the suppression hearing, Callahan pointed

12

out how the area in which Williams was arrested is designated as a "gang conflict" area. *Id.* at 24:5–11. Indeed, Callahan emphasized that these statistics undercounted the quantum of crime in the area because many crimes go unreported, typically due to the public's fear of retaliation. *Id.* at 18:13–19:11. For that reason, Callahan also conducted field interviews to "keep a pulse on the neighborhood" and learn "where drugs are being sold out of, who's selling drugs, who's carrying weapons, who's shooting, who is about to get shot, who is – who is always walking around with a gun." *Id.* at 18:3–8. Indeed, Callahan also knew that the Chicago Housing Authority complex where Williams was arrested had its own private armed security force of three to five full-time guards and a security office. *Id.* at 27:19-23, 28:2-11.

Against all this, Williams argues that some of the crimes reflected on the CLEAR database map were merely burglaries and larcenies, rather than violent crimes or firearms offenses. *See* Tr. at 98–99. Williams also proffers that the specific police beat, Beat 1823, actually had one of the fewest number of reported crimes from July 2019 to July 2020. *See* Tr. at 5–6, 102. But these arguments do not undermine Officer Callahan's assessment that the flight happened in a high-crime area. The defense's statistical proffer, even accepting it as true, does not account for *unreported* crimes, which Callahan credibly testified he learns about from talking with people in the neighborhoods. Tr. at 18–19, 97. What's more, Williams proposes a level of statistical exactness that is not supported by precedent. To be sure, it is important to test an officer's testimony on "high-crime" areas lest the designation be made simply *ipse dixit* by any officer about any neighborhood in the City. Worse, implicit assumptions

based on demographics might creep into an officer's view of the quantum of crime in a neighborhood. Having said that, the Seventh Circuit has pointed out that no precedent supports the proposition that "the government must produce 'specific data' establishing that a location is a 'high-crime area.'" *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005). Nor is geographic precision required. *See United States v. Adair*, 925 F.3d 931, 936-37 (7th Cir. 2019) (rejecting the defense argument that the true high-crime area was in an area 900 feet away from the arrest). Based on Callahan's credible testimony, combined with the objective fact that the Chicago Housing Authority has a security office with armed security guards right on that block, the Court finds that Williams's flight took place in a high-crime area.

Finally, Williams demands that, to satisfy the reasonable-suspicion burden, there ought to be a suspicious fact beyond flight in a high-crime area. But indeed there was. The street-camera video confirms what Callahan described: as Williams ran away, he continuously clutched at his left jacket pocket. Within a split second of Williams beginning to run, he presses his left arm close against his left side while his right arm continues to pump. Joint Video 1 at 11:48:35-40 AM. Even as he runs further down the street, the video shows Williams pumping his right arm back-and-forth much, much more that his left arm, which remains closer to his side, *id.* at 11:48:41-45 AM, all corroborating Callahan's testimony that Williams kept clutching something on his left side. At the suppression hearing, Callahan credibly testified that, in his experience, this sort of side-clutching suggested that Williams was trying to secure an unholstered weapon. Tr. at 35:19-36:15.

In combination, then, Williams's headlong flight from the officers in a high-crime area and the clutching of his left side to secure what Callahan reasonably believed to be a weapon provided reasonable suspicion to seize Williams at the fence.

### D. Pat-Down with Restraints

Next, Williams challenges the search that yielded the gun and crack cocaine. It is important to remember that, as Williams laid down on the ground, Officer Callahan credibly testified that he heard a "metallic clink" that sounded "like dropping metal on concrete." *Id*. at 40:11-20. This sound "reconfirmed [Callahan's] suspicions" that Williams had a gun in his jacket pocket. *Id*. at 42:3-6. So for his own "safety and for everybody else's safety," he testified that he "climbed on top of [Williams] and handcuffed him behind his back" and "did a pat-down on [Williams's] left jacket pocket." *Id*. at 42:7-19. According to the government, Callahan was conducting a pat-down as part of a mere investigatory stop. But Williams argues that the straddling and cuffing of Williams converted the stop into a full-blown arrest, which would require probable cause.

This is a close call, but the Court concludes that, when Callahan searched Williams, the officer was still making a *Terry* stop rather than effectuating a full-blown arrest. Under *Terry*, an officer may conduct a brief investigative stop when he reasonably suspects a person to be engaged in criminal behavior. *Adair*, 925 F.3d at 935 (citing *Terry v. Ohio*, 392 U.S. at 21-22). As part of this type of stop, the officer may conduct a "frisk—a limited pat down of the suspect's outer clothing to search for weap-

ons … if [he] can point to specific and articulable facts indicating that criminal activity may be afoot and that the person[] with whom he is dealing may be armed and presently dangerous." *United States v. Howell,* 958 F.3d 589, 598 (7th Cir. 2020) (cleaned up). But "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Rabin v. Flynn*, 725 F.3d 628, 643 (7th Cir. 2013) (Rovner, J., concurring) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "Given the endless variations in the facts and circumstances, there is not a litmus paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest." *U.S. v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). With this in mind, the Court considers whether Callahan made an arrest rather than an investigatory stop.

Start with the handcuffing of Williams: although the use of handcuffs "is not a normal part of a *Terry* stop, it does not automatically turn a *Terry* stop into an unlawful arrest." *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010). Instead, courts have "sustained the use of handcuffs during *Terry* stops when the circumstances suggested … that an individual stopped for questioning might have a weapon." *Rabin*, 725 F.3d at 639 (Rovner, J., concurring) (citing cases). Courts have also upheld the use of handcuffs when an officer accosts a subject while alone for "[the officer's] own safety and the safety of anyone else who might [be] in the area." *United States v. Wilson*, 2 F.3d 226, 232 (7th Cir. 1993). Here, Callahan was confronted with a dangerous situation: he had seen Williams flee while clutching something on his left side, and now Callahan was alone with a person suspected of being armed. Tr. at

42. A reasonable officer also could conclude that it would be harder for Williams to start running again if he were cuffed. All in all, handcuffing Williams was a reasonable part of this particular investigatory stop.

So, too, was Officer Callahan's decision to sit on Williams during the stop. Even if cuffed, Williams had just sprinted away from officers and (twice) hopped over a fence. Just because Williams had stopped running at that time did not mean that there was not every risk that Williams would try to run again. So immobilizing Williams served both to reasonably minimize the danger of an armed suspect and minimize the chances of resumed flight. As the Seventh Circuit has explained, "the mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety." *United States v. Tilmon*, 19 F.3d 1221, 1226 (7th Cir. 1994).

It is true that Officer Callahan did not *just* handcuff or *just* sit on Williams in preparation for a pat-down. He performed both restraints on Williams together at the same time; the combination is significant for Fourth Amendment purposes. The Supreme Court instructs that "the investigative methods [used during an investigatory stop] should be the *least intrusive* means reasonably available to verify or dispel the officer's suspicion." *Royer*, 460 U.S. at 500 (emphasis added). Otherwise, police restraint may become so intrusive that, while not technically an "arrest," it becomes "tantamount" to an arrest requiring probable cause. *Tilmon*, 19 F.3d at 1224; *see also Rabin,* 725 F.3d at 632-33 ("When an officer's use of force during [] a *Terry* stop becomes so disproportionate to the purpose of such a stop in light of the surrounding

17

circumstances—and the purpose may include ensuring the safety of the officers or others—then the encounter becomes a formal arrest (which must then be justified by probable cause).").

Having said that, given the fact-bound nature of these determinations, there is no "litmus paper test for when a seizure exceeds the bounds of an investigative stop" and becomes an arrest. *Royer*, 460 U.S. at 506. Here, to repeat, Callahan had every reason to believe that Williams was armed—especially after the side-clutching flight and then hearing the metallic clink of the gun—so the handcuffing was not only reasonable but ought to be the norm for officers in this specific factual scenario. Although the handcuffing would make it harder to run again, there was no guarantee of that, and remember that Callahan was alone with Williams after Williams had desperately fled from officers. So the combination of both handcuffs and immobilization, although a close call, did not turn the investigatory stop into a formal arrest.

### E. Probable Cause for an Arrest

Even if what Officer Callahan did amounted to a formal arrest rather than an investigatory stop, still the seizure and the ensuing search were reasonable because there was probable cause to arrest Williams. Probable cause exists when "a reasonable person, knowing all of the facts and circumstances known to the officer, would believe that the individual in question has committed or is committing a crime." *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019). Probable cause requires only "a probability or substantial chance [that] criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha*

*v. Vill. of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011). Here, the question is whether there was probable cause to believe that Williams unlawfully possessed a firearm. The key point in time is *before* Callahan pulled the gun from Williams's pocket and *before* Williams was asked whether he had the requisite firearms licenses.

The facts do support a finding of probable cause at that key moment. It is true that neither Illinois nor Chicago criminalizes all gun possession in public. Not surprisingly, mere gun possession standing alone cannot establish probable cause (setting aside gun possession that is illegal in certain areas, such as in a liquor store, 720 ILCS 5/24-1(a)(8)). *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018) (explaining that, when a 911 caller reported "boys … playing with guns" in a parking lot, no probable cause existed in part because gun possession by itself was not inherently unlawful).[5] Here, however, the facts go well beyond mere gun possession. When

---

[5]Whether mere possession is suspicious at all depends primarily on the relevant state law. On one side of the divide, in States where gun possession is seen as presumptively legal, courts have eliminated gun possession as a sufficient basis even for reasonable suspicion. *See United States v. Ubiles*, 224 F.3d 213, 217–18 (3rd Cir. 2000) (holding that because the Virgin Islands do not assume concealed weapons are illegal, gun possession is not a basis for reasonable suspicion); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) (holding that gun possession is not a basis for reasonable suspicion because North Carolina permits residents to openly carry and it is "not the default status" for individuals to face the restrictions on possession that felons do); *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131-33 (6th Cir. 2015) (no reasonable suspicion because concealed carry is not presumptively illegal in Ohio); *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019) (no reasonable suspicion based on combination of defendant's flight from police and gun possession where Washington law makes possession presumptively lawful).

On the other side, primarily in jurisdictions where gun possession is presumptively *illegal* without substantial licensure requirements, possession may support a *Terry* stop or even more. *United States v. Pontoo*, 666 F.3d 20, 31-32 (1st Cir. 2011) (finding probable cause based on possession of concealed handgun because Maine prohibits concealed carry unless one jumps through "several procedural hoops"); *United States v. Gatlin*, 613 F.3d 374, 378–79 (3rd Cir. 2010) (distinguishing *Ubiles* to find reasonable suspicion because Delaware, unlike the Virgin Islands, presumes concealed firearms are illegal); *United States v. Bridges*,

gun possession is paired with evasive or other suspicious conduct, probable cause can be found. *See United States v. Dancy*, 640 F.3d 455, 462 (1st Cir. 2011) (probable cause to arrest defendant during investigatory stop when officer felt gun in pocket and defendant resisted attempts to secure it); *United States v. Bennett*, 604 Fed. App'x 11, 13 (2nd Cir. 2015) (summary order) (probable cause where defendant lied to officers and they observed him place a gun in a doorway and attempt to flee); *United States v. Johnson*, 432 Fed. App'x 118, 121 (3rd Cir. 2011) (non-precedential opinion) (probable cause where defendant fled from police and discarded firearm during flight); *United States v. Goss*, 537 Fed. App'x 276, 280 (4th Cir. 2013) (unpublished disposition) (probable cause based on tip about a gun plus defendant's flight and tossing gun in bushes); *United States v. Joseph*, 445 Fed. App'x 301, 304-5 (11th Cir. 2011) (unpublished opinion) (probable cause where defendant fled and reached in waistband, refused commands to stop, sought refuge on a roof, and tossed a dark object later discovered to be a gun).

Here, the Illinois Firearm Concealed Carry Act, 430 ILCS 66/ *et seq.*, sets forth the requirements for obtaining a concealed-carry license:

---

2016 WL 3922354 at *5–6 (E.D. Mich. 2016) (distinguishing *Northrup* to find reasonable suspicion because in Michigan concealed carry is illegal *unless* you have a permit); *United States v. Pope*, 910 F.3d 413, 415–16 (8th Cir. 2018) (finding reasonable suspicion based on concealed weapon because in Iowa concealed weapons are presumed illegal and permits are merely an affirmative defense); *Foster v. City of Indio*, 908 F.3d 1204, 1216 (9th Cir. 2018) (finding reasonable suspicion because California generally prohibits concealed firearms in public and strictly limits permits); *United States v. Briggs*, 720 F.3d 1281, 1287–89 (10th Cir. 2013) (finding that grabbing behavior suggesting a concealed firearm contributed to reasonable suspicion even though a concealed weapon would not be against the law with a permit); *United States v. Lewis*, 674 F.3d 1298, 1304–05 (11th Cir. 2012) (finding reasonable suspicion based on gun possession where a concealed carry permit is considered an affirmative defense).

> The Department [of State Police] shall issue a license to carry a concealed fire-arm under this Act to an applicant who: (1) meets the qualifications of Section 25 of this Act; (2) has provided the application and documentation required in Section 30 of this Act; (3) has submitted the requisite fees; and (4) does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board in accordance with Section 20.

430 ILCS 66/10. The qualifications referred to in Section 25 of the Act are substantial: applicants must undergo 16 hours of firearms training with various certification requirements, as well as fingerprinting, photographing, a written application, application fee, and other background and administrative checks. 430 ILCS 66/25, 66/30, 66/35, 66/75. Given these requirements, a law enforcement officer in Illinois who encounters a person with a concealed firearm would not necessarily assume that the possession is legal.

More to the point, here there was more than mere possession. After the officers started to get out of their cars, Williams almost immediately started a desperate flight. Far from continuing to "go about his business" once the officers pulled up, he immediately sprinted away, thus engaging in the "consummate act of evasion." *Wardlow*, 528 U.S. at 124. Williams clutched his left side as he fled, leading Officer Callahan to reasonably infer that Williams was holding a weapon there. The flight suggested that Williams had something to hide; otherwise, why run? Then, Callahan heard the metallic clink when Williams laid down on the ground. That was the final piece of the puzzle: there was probable cause to believe that Williams was illegally carrying a gun. So the arrest (if that is what it was) was valid and the ensuing search incident to arrest justified the recovery of the gun and drugs.

### III. Conclusion

For the reasons explained above, Williams's motion to suppress is denied. The tracking status hearing of January 8, 2021, is reset to January 22, 2021, to allow Williams to confer with defense counsel and for the parties to confer with one another, but to track the case only (the case will not be called). Instead, the parties shall file a written status report by January 15, 2021. Pursuant to 18 U.S.C. 3161(h)(7)(A) and (B), time is excluded under the Speedy Trial Act through January 22, 2021, to allow for the Defendant to confer with defense counsel.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 1, 2021